Wells Fargo Bank, N.A.

**AGREEMENT DATE:** 01-02-2007
**ACCOUNT #:**
**REFERENCE #:**



# SmartFit Home Equity Account® Agreement
# and Disclosure Statement (the "Agreement")

**Borrower Name:** MICHELLE L BONNER

**Property Address:** 1088 MAPLE AVENUE, GLENSIDE, PENNSYLVANIA 19038

**Mailing Address for Billing Purposes (if different):** N/A

**Credit Line Limit:** 168,000.00

## SECTION 1: MY ACCOUNT AGREEMENT

In this Agreement, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A. and any successor or assign or subsequent holder of this Agreement. This Agreement governs my SmartFit Home Equity Account® (the "Account") with the Bank. If more than one person signs this Agreement, we are jointly and individually bound by its terms. We are separately liable to the Bank for the entire amount owed on the Account. We are each liable as a principal and not merely as a guarantor, even if one or more of us does not use the Account.

## SECTION 2: SECURITY INTEREST

I am giving the Bank a deed of trust, mortgage or other security instrument including all modifications, addenda and amendments thereto (the "Security Instrument"), signed the same date as this Agreement. The Security Instrument gives you a security interest in the property located at the address shown above (the "Property").

## SECTION 3: MY SMARTFIT HOME EQUITY ACCOUNT®

My Account is a revolving account. My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period (described below), my available credit will be my credit limit minus the sum of all unpaid Advances posted to my Account. During the Draw Period, as I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I may apply for an increase in my credit limit, and if I do so I agree to pay any application, appraisal and other fees, including increased costs for title insurance, as the Bank may require. If the Bank approves my application and increases my credit limit, I will provide and maintain such additional hazard insurance (including flood insurance, if necessary) and sign any additional documents as the Bank may require. All such increased credit amounts will be

06 MAR 0 6 2007 1 1 1

governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

The Bank may from time to time in its sole discretion, approve additional credit for me under the terms of this Agreement. I will receive written notice from the Bank of any such offer to increase my credit limit. I may accept such offer of increased credit by my use of those additional funds and by signing any additional documents the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

### DRAW PERIOD
My Account has a Draw Period of 10 years from the date of this Agreement during which I may request Advances. At the end of the Draw Period, I may request that the Bank renew the Draw Period for an additional 10 years. The Bank may, at its option, approve my request to extend the Draw Period. I may not obtain Advances after the Draw Period ends.

When the Draw Period ends, the outstanding unpaid Line of Credit Advances will convert to a Final Fixed Rate Advance as detailed below in Section 5, MY ACCOUNT DURING THE REPAYMENT PERIOD.

### ADVANCES DURING THE DRAW PERIOD
There are 3 types of Advances on my Account:

- Fixed Rate Initial Advance
- Fixed Rate Advances
- Line of Credit Advances

The Bank must honor my request for a Fixed Rate Initial Advance and for subsequent Fixed Rate Advances and Line of Credit Advances (collectively, "Advances") as long as I am in compliance with all terms of this Agreement, including all modifications, addenda and amendments to it, and the Security Instrument.

As I use my Account, my available credit will be my credit limit minus the sum of all unpaid Advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I will not request an Advance that would cause the balance in my Account to exceed my credit limit, or which would violate the terms of this Agreement or any law. If I do exceed my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I understand that the Bank may refuse to allow any Advance if the Advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an Advance that does not comply. The Bank may allow any Advances in any sequence convenient to the Bank.

The Bank is authorized to make an Advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any Advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

### FIXED RATE INITIAL ADVANCE
Any Advances made when you open my Account (or within 5 days thereafter) will be aggregated and treated as a single Fixed Rate Initial Advance. For purposes of this section, Account opening is considered to be the first day on which I may receive Advances (i.e., after any applicable rescission period). My Fixed Rate Initial Advance will have the fixed rate disclosed below and a term of 5 years. My Minimum Monthly Payment for the Fixed Rate Initial Advance shall be equal to the sum of all earned and unpaid periodic FINANCE CHARGES on the Fixed Rate Initial Advance.

At the end of the payment term for the Fixed Rate Initial Advance, any remaining balance from the Fixed Rate Initial Advance will be converted to a Line of Credit Advance.

## FIXED RATE INITIAL ADVANCE PERIODIC FINANCE CHARGES

Finance charges begin to accrue on the Fixed Rate Initial Advance immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Initial Advance (including current transactions) each day. To determine the daily balance, take the Fixed Rate Initial Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement) and subtract any payments or credits that apply to the repayment of the Fixed Rate Initial Advance. The result is the daily balance.

The Daily Periodic Rate for the Fixed Rate Initial Advance is 0.020890% (corresponding **ANNUAL PERCENTAGE RATE** of 7.625%). The ANNUAL PERCENTAGE RATE does not include costs other than interest.

## LINE OF CREDIT ADVANCES

Each Line of Credit Advance I request will be in the amount of $300 or greater.

## LINE OF CREDIT ADVANCE METHODS

While my Account is not in default, closed, or suspended, I may obtain a Line of Credit Advance by:

- Requesting a Line of Credit Advance in person at any Bank branch.
- Requesting a Line of Credit Advance by phone.
- Transferring funds by using Wells Fargo Online®
- In other ways the Bank authorizes from time to time.
- Obtaining a cash withdrawal or transferring funds by using my Wells Fargo ATM Card or Wells Fargo ATM & Check Card, if offered by the Bank and I select such service.
- Writing an Advance request check or draft which the Bank has provided to me.
- Using my EquityLine Platinum® card, if offered by the Bank and I select such service.

## LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES

Finance charges begin to accrue on Line of Credit Advances immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for Line of Credit Advances (including current transactions) each day. To determine the daily balance, take the Line of Credit Advances balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), add any new Line of Credit Advances, and subtract any payments or credits that apply to the repayment of Line of Credit Advances. The result is the daily balance.

The Daily Periodic Rate for Line of Credit Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Margin, the initial Daily Periodic Rate, and the initial ANNUAL PERCENTAGE RATE, are each disclosed below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on my Line of Credit Advances will be adjusted the day after an Index change is published, using the new Index value. Therefore, the Daily Periodic Rate for Line of Credit Advances may change (increase or decrease) as often as once each day based on changes in the Index. I understand that any increase may cause me to make larger monthly payments.

## LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES

The Daily Periodic Rate for Line of Credit Advances will never exceed 0.049315% (corresponding **ANNUAL PERCENTAGE RATE** of 18.00%). This is the Lifetime Rate Cap for Line of Credit Advances.

**LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES**
The Daily Periodic Rate for Line of Credit Advances will never fall below 0.011616% (corresponding **ANNUAL PERCENTAGE RATE** of 4.240%). This is the Lifetime Rate Floor for Line of Credit Advances.

**MY INITIAL RATE FOR LINE OF CREDIT ADVANCES**
As discussed above, my Daily Periodic Rate is based on the value of the Index plus a Margin. The initial Index value that applies to my Account will be the value of the Index on the day I open my Account. The following disclosures are based on the value of the Index in effect on 01-02-2007. I understand that if I open my Account after this date, my actual Index value, Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE may be higher or lower than the rates disclosed below.

My Margin for Line of Credit Advances is equal to - TWO HUNDRED FIFTY THOUSANDTHS OF ONE PERCENTAGE POINT (-0.250%) (the "Margin"). As a result, unless the Lifetime Rate Cap for Line of Credit Advances or Lifetime Rate Floor for Line of Credit Advances require the Bank to apply a different rate to my Account, my initial Daily Periodic Rate is 0.021918% (corresponding **ANNUAL PERCENTAGE RATE** of 8.000%).

**LINE OF CREDIT ADVANCES MINIMUM MONTHLY PAYMENT**
During the Draw Period, my Minimum Monthly Payment for Line of Credit Advances shall be equal to:

> The sum of all earned and unpaid periodic FINANCE CHARGES on Line of Credit Advances, plus credit insurance premiums, if any.

**FIXED RATE ADVANCES DURING THE DRAW PERIOD**
I have the option to convert outstanding unpaid Line of Credit Advances to Fixed Rate Advances during the Draw Period based on credit limit availability. The minimum Fixed Rate Advance during the Draw Period is $10,000.

I may request up to 8 Fixed Rate Advances in addition to the Fixed Rate Initial Advance during the Draw Period. No more than 3 Fixed Rate Advances, including the Fixed Rate Initial Advance, may be outstanding at any one time. At the time I request a Fixed Rate Advance, I may select the repayment term for that Fixed Rate Advance. The repayment term must be a period of whole years and in the range described below:

| Fixed Rate Advance Amount | Term Range |
|---|---|
| $10,000 - 19,999.99 | 5 to 15 years |
| $20,000 - 49,999.99 | 5 to 30 years |
| $50,000 and above | 7 to 30 years |

**FIXED RATE ADVANCE METHODS DURING THE DRAW PERIOD**
While my Account is not in default, closed, or suspended, I may obtain a Fixed Rate Advance by:

- Requesting a Fixed Rate Advance in person at any Branch bank
- Requesting a Fixed Rate Advance by phone

**FIXED RATE ADVANCES PERIODIC FINANCE CHARGES DURING THE DRAW PERIOD**
Fixed Rate Advances will accrue periodic FINANCE CHARGES beginning on the day that the Bank converts any Line of Credit Advances to a Fixed Rate Advance. I will be charged a periodic FINANCE CHARGE on all outstanding unpaid Fixed Rate Advances each day at a fixed Daily Periodic Rate. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Advance (including current transactions) each day. To determine the daily balance for the Fixed Rate Advance, take the Fixed Rate Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), and subtract any payments or credits that apply to the repayment of the Fixed Rate Advance. The result is the daily balance.

The Daily Periodic Rate for Fixed Rate Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a Fixed Rate Advance. The Margin for Fixed Rate Advances is eight percentage point(s) (8.0%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE for Fixed Rate Advances will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

### LIFETIME RATE CAP FOR FIXED RATE ADVANCES DURING THE DRAW PERIOD
The Daily Periodic Rate for Fixed Rate Advances will not exceed 0.0493% (corresponding **ANNUAL PERCENTAGE RATE** of 18.000%). This is the Lifetime Rate Cap for Fixed Rate Advances.

### FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD
During the Draw and Repayment Periods, my Minimum Monthly Payment for each Fixed Rate Advance will be equal to the amount of principal plus periodic FINANCE CHARGE sufficient to repay the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at the applicable corresponding ANNUAL PERCENTAGE RATE. This assumes that all payments will be made on their due dates, which will be the same as the due dates for my Line of Credit Advances Minimum Monthly Payment described above. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher. During the Draw Period, my available credit for new Line of Credit Advances will be replenished by the amount of principal I repay on my Fixed Rate Advances.

### MY TOTAL PAYMENT DUE DURING THE DRAW PERIOD
I will receive monthly billing statements from the Bank. I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Draw Period consists of my Fixed Rate Initial Advance Minimum Monthly Payment plus my Line of Credit Advances Minimum Monthly Payment plus my Fixed Rate Advances Minimum Monthly Payment(s) together with all past due amounts and overlimit amounts and all other charges due.

## SECTION 5: MY ACCOUNT DURING THE REPAYMENT PERIOD

### REPAYMENT PERIOD
I understand that I may not receive new Advances after the Draw Period ends. At that time, I will begin the Repayment Period, which will continue until the Maturity Date described below, but in no event more than 30 years.

### REPAYMENT OF OUTSTANDING FIXED RATE ADVANCES
During the Repayment Period, I will continue to make any Fixed Rate Advance Minimum Monthly Payments that were in effect at the end of the Draw Period. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

### REPAYMENT OF FINAL FIXED RATE ADVANCE
At the end of the Draw Period, the outstanding unpaid Line of Credit Advances balance will be converted into a final Fixed Rate Advance (the "Final Fixed Rate Advance"). The Final Fixed Rate Advance will have a term of 15 years if my total unpaid Line of Credit Advances balance is less than $20,000, or 30 years if my total unpaid Line of Credit Advances balance is $20,000 or more (unless I request a shorter term).

The Final Fixed Rate Advance Minimum Monthly Payment will be the greater of $100 or an amount sufficient to repay the Final Fixed Rate Advance balance by the end of the scheduled term in substantially equal, fully amortizing monthly payments of principal and periodic FINANCE CHARGE at the applicable corresponding ANNUAL PERCENTAGE RATE. If my payments are not consistently made when due, the Final Fixed Rate Advance Minimum Monthly Payment may not fully repay the Final Fixed Rate Advance over its term and my

final payment for the Final Fixed Rate Advance may be higher. The Bank will notify me in advance of any changes to my Total Payment Due as a result of the Final Fixed Rate Advance Minimum Monthly Payment.

### PERIODIC FINANCE CHARGE ON FINAL FIXED RATE ADVANCE BALANCE
Periodic FINANCE CHARGES on my Final Fixed Rate Advance balance will begin to accrue on the first day of the Repayment Period. I will be charged a periodic FINANCE CHARGE based on the unpaid Final Fixed Rate Advance balance at the end of each day at a fixed Daily Periodic Rate.

The Daily Periodic Rate for the Final Fixed Rate Advance is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the Index value published on the last business day during the Draw Period. The Margin for the Final Fixed Rate Advance is eight percentage point(s) (8.0%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE on my Final Fixed Rate Advance will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

### LIFETIME RATE CAP FOR MY FINAL FIXED RATE ADVANCE
The Daily Periodic Rate for my Final Fixed Rate Advance will not exceed 0.0493% (corresponding **ANNUAL PERCENTAGE RATE** of 18.000%). This is the Lifetime Rate Cap for my Final Fixed Rate Advance.

### MY TOTAL PAYMENT DUE DURING THE REPAYMENT PERIOD
I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Repayment Period is the total of each Fixed Rate Advances Minimum Monthly Payment that is still due as the result of Fixed Rate Advances in effect on the day before the end of the Draw Period, plus the Final Fixed Rate Advance Minimum Monthly Payment as described above, together with all past due amounts and overlimit amounts and all other charges due.

### MATURITY DATE
The Maturity Date on my Account shall be the latest maturity date of any Fixed Rate Advance or the Final Fixed Rate Advance, but in no event more than 30 years from the end of the Draw Period. At that time, any remaining balance must be paid in full.

## SECTION 6: AUTOMATIC PAYMENT DISCOUNT

The Automatic Payment Discount is not applicable to this Account.

## SECTION 7: OTHER FINANCE CHARGES

In addition to paying periodic FINANCE CHARGES, as described in Sections 4 and 5 above, I also agree to pay the following additional fees, each of which is a **FINANCE CHARGE**:

N/A

## SECTION 8: CLOSING COSTS

I agree to pay to the Bank the following closing costs at the opening of my Account:

| | | |
|---|---|---|
| ENDORSEMENT | $ | 150.00 |
| TITLE INSURANCE | $ | 1,408.75 |
| PEST INSPECTION | $ | 75.00 |
| On-Line Appraisal | $ | 3.00 |
| Recording Fee* | $ | 181.00 |
| STATE TAX | $ | 2,100.00 |

SmartFit Agreement

| | | |
|---|---|---|
| NOTARY FEES* | $ | 25.00 |
| DOCUMENT PREPARATION | $ | 25.00 |

\* These amounts are estimates. The actual amounts charged and paid for these fees are shown on the HUD Settlement Statement that is attached to and incorporated into this Agreement by reference.

The following closing costs are **FINANCE CHARGES:**

| | | |
|---|---|---|
| Flood Hazard Determination | $ | 19.00 |
| CLOSING PROTECTION LETTER | $ | 35.00 |
| DEED REGISTRATION | $ | 10.00 |
| Wire/Fax Fee | $ | 20.00 |

## SECTION 9:  ADDITIONAL FEES, COSTS AND CHARGES

In addition to the FINANCE CHARGES and closing costs described above, I agree to pay the following non-refundable fees, costs and charges, which will be owed once charged to my Account.

### ANNUAL FEE
Beginning three years after the date of this Agreement, and continuing each year of the Draw Period, whether or not I use the Account, a $75.00 non-refundable annual fee will be charged to my Account. This fee is waived the first three years my Account is opened, and is billed beginning in the fourth and each succeeding year, during the Draw Period, on the anniversary date of this Agreement.

### LATE CHARGES
During the Draw Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the Line of Credit Minimum Monthly Payment if my payment is more than 10 days past due.

During the Repayment Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the sum of all Fixed Rate Advance Minimum Monthly Payments if my payment is more than 10 days past due.

### PREPAYMENT FEE
I have requested a waiver of the prepayment fee. I understand that the Margin disclosed in Section 4 above for Line of Credit Advances has been increased by one-quarter of one percentage point (0.25%) in consideration of the Bank's waiver of the prepayment fee that would otherwise apply to this Agreement.

### OTHER CHARGES
To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:

(a) **Fax Fee:**  The Bank will charge a fax fee in the amount of ten dollars ($10.00) if I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine.

(b) **Research Fee and Photocopy Fee:**  The Bank will charge a research/photocopy fee in the amount of five dollars ($5.00) per photocopy if I request or authorize others to request that the Bank research my Account or provide photocopies of Account documents for any purpose other than a billing error inquiry.

(c) **Reconveyance or Satisfaction Fee:**  The Bank will charge reconveyance and satisfaction fees as allowed by applicable law.

(d) **Stop Payment Fee:**  The Bank will charge a stop payment fee in the amount of twenty-five dollars ($25.00) if I request or authorize others to request that the Bank stop payment on a draft I have used to request a Line of Credit Advance.

(e) **Return Check Fee:**  The Bank will charge a return check fee in the amount of twenty-five dollars ($25.00) if I make a payment with a check that is dishonored for any reason.

(f) **Overlimit Fee:**  The Bank will charge an overlimit fee in the amount of twenty-five dollars ($25.00) for each billing cycle in which I have exceeded my credit limit or have requested an Advance that would have caused me to exceed my credit limit.

(g) **Return Advance Check Fee (insufficient funds):**  The Bank will charge a return advance check fee in the

amount of twenty-five dollars ($25.00) for each check or draft used to request a Line of Credit Advance that is returned unpaid (dishonored) by the Bank due to the requested Advance not meeting all requirements of this Agreement.

## SECTION 10:  COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument, unless prohibited by applicable law.

## SECTION 11:  METHOD OF PAYMENT

Depending on my chosen method of payment, the Bank will do one of the following each monthly billing cycle, during both the Draw and Repayment Periods:

**Monthly Billing Statement:**  Provide me with a monthly billing statement showing the Total Payment Due and the due date, and including a remittance portion that I must return with my monthly payment.

## SECTION 12:  SCHEDULED PAYMENT DUE DATE

My monthly payment due date for my Total Payment Due is the 1ST day of each and every month during both the Draw and Repayment Periods.

## SECTION 13: MY PROMISE TO PAY

I promise to pay to the order of the Bank the total of all Advances which I receive or which I authorize to be made from my Account.  I promise to pay the total of any FINANCE CHARGE, plus all amounts past due, overlimit amounts, and any late charges, fees, other charges and other obligations charged to my Account under this Agreement or the Security Instrument.  All payments made under this Agreement will be made in U.S. Dollars.  I will not mail any cash payments to the Bank.  I may not use Advance request checks to make payments on my Account.

The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment due in order to assure that my check or other payment instrument is honored.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank.  Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I understand that payments I make by mail to the address indicated on my billing statement or payment coupon will be credited to my Account as of the date received (including Saturdays, Sundays, and holidays) if the Bank receives the payment prior to 5 p.m. local time for the payment address.

Payments I make from a qualified account ("Automatic Payments") pursuant to an Authorization for Automatic Transfer will be credited to my Account on the date received (including Saturdays, Sundays, and holidays).

Payments I make at a Bank branch and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank.  For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and Bank observed holidays.  Payments made at a Bank branch received on a Saturday, Sunday, or Bank observed holiday or after established cut-off times will be credited as of the next business day.

Payments I make online, by ATM, by telephone, or by any other means the Bank may make available to me and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank.  For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and federal holidays.  Payments made online, by ATM, by telephone, or by any other means the Bank may make

available to me received on a Saturday, Sunday, or federal holiday or after established cut-off times will be credited as of the next business day.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 14:  TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 15:  REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action, or (d) any other legitimate purposes associated with my Account. I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine and reevaluate my credit qualifications at any time. The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 16:  PAYOFF BALANCE INFORMATION

The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request. If such request is made on my behalf by an escrow holder, settlement agent or other third party on my behalf during the Draw Period, the Bank may immediately freeze my Account. I agree that the Bank's receipt of such a request from an escrow holder, settlement agent or other third party on my behalf will be considered to be a request by me to suspend credit privileges on my Account. While my Account is frozen, I cannot receive new Advances and the Bank will return unpaid any Advance request checks the Bank receives and will refuse to honor any other Advance request made on my Account. This payoff freeze will be lifted and my Account reopened if the request for payoff balance information is withdrawn and the Bank has received written confirmation from the escrow holder, settlement agent or other third party on my behalf that the escrow or other settlement has been cancelled.

## SECTION 17:  DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent, failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement, or (d) I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of my entire Account balance.

If I am in default, the Bank, subject to applicable law, may do any or all of the following:  (a) close my Account immediately, without notice; (b) return unpaid any outstanding Advance request checks drawn on my Account

and refuse to honor any other Advance request made on my Account; and (c) require immediate payment of the entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Security Instrument, which may result in the loss of the Property. If I am in default, the method of determining the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will remain as described in this Agreement.

The Bank and I agree that notwithstanding any other provision of this Agreement or the Security Instrument, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

## SECTION 18: CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT; REINSTATEMENT OF CREDIT

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BORROWER
Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting that the Account be closed. Any one Borrower may terminate the Advance feature, at any time during the Draw Period, by sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting the termination of the Advance feature. To reactivate the Advance feature on the Account during the Draw Period, the Bank will require all Borrowers to sign a written request and mail to the address indicated on my monthly billing statement.

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BANK
I will receive a written notice if the Bank suspends or freezes my Account or reduces my credit limit as required under applicable law. The notice will include the reason(s) for such action(s). Thereafter, if I wish to reinstate my Account or increase my credit limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s). I also agree to provide the Bank promptly with any additional information necessary to support my request.

The Bank may suspend the use of my Account and temporarily prohibit future Advances during the Draw Period, or the Bank may reduce my credit limit, for any reason permitted by applicable law, including without limitation, (a) if the annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 17 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account. To the extent permitted by applicable law, I agree to pay to the Bank the cost of obtaining such additional information.

If my Account is closed or suspended for any reason, the Bank may return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account. I will continue to be responsible for full payment of the balance of my Account as well as all other Account obligations, according to the terms of this Agreement.

## SECTION 19: FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement become and continue to be secured by the Security Instrument.

## SECTION 20: CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property. I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property, unless prohibited by applicable law. In this regard, I understand that my Account is secured by a Security Instrument containing the following or a substantially similar provision:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 13 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## SECTION 21: CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events. The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which Index values are determined, Index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the interest or FINANCE CHARGE I am required to pay). The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees. In accordance with federal law, the Bank may also change the Index and Margin used to determine the ANNUAL PERCENTAGE RATE(S) that apply to my Line of Credit Advances and/or Fixed Rate Advances if the original Index is no longer available. The Bank may make any of the changes discussed above without my consent, unless applicable law provides otherwise. The Bank will give me any notice of change that is required by law. I may also agree to changes in writing.

## SECTION 22: WAIVERS

### BORROWER'S WAIVERS

I waive my rights to require the Bank to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Agreement, or who agrees to make payments to the Bank if I fail to keep my promises under this Agreement, or who signs this Agreement to transfer it to someone else, waives these rights. These persons are known as "guarantors, sureties and endorsers."

### BANK'S NON-WAIVER

The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations. The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Agreement.

## SECTION 23: GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered

"interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law. In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted by federal law with respect to national banks and, to the extent not preempted by federal law, the laws of the state in which the Property is located.

If any provision of this Agreement or the Security Instrument is determined to be invalid or unenforceable by a court of competent jurisdiction, the rest of this Agreement will remain in full force and effect and enforceable according to its terms. All references in this Agreement to the singular shall include the plural and vice versa.

## SECTION 24:  LOST OR STOLEN ADVANCE REQUEST CHECKS; BILLING ERRORS

### LOST OR STOLEN ADVANCE REQUEST CHECKS (WHERE AVAILABLE); BILLING ERRORS

I will immediately contact the Bank at the phone number on my monthly billing statement and confirm by letter if any of my Advance request checks are ever lost or stolen, if there are any errors in my monthly billing statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled Advance request checks or other Advance request instruments after paying them. The Bank will make available photocopies of my Advance request checks and other Advance request instruments upon request. I will examine my Account statements promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each Advance request check, I agree that even though I will not receive the original Advance request checks, all time periods under the Uniform Commercial Code (UCC) for examining my monthly billing statement and reporting improper entries, including the UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is first sent or made available to me.

### UNAUTHORIZED TRANSACTIONS

I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my monthly billing statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank branch office. I may also send written notice to the Bank at the address indicated on my billing statement.

### Billing Rights - Keep This Notice For Future Use

This notice contains important information about my rights and the Bank's responsibilities under the Fair Credit Billing Act.

### Notify The Bank In Case Of Errors Or Questions About My Bill

If I think my billing statement is wrong, or if I need more information about a transaction on my billing statement, I will send a letter on a separate page to the Bank, as soon as possible, at the address listed on my billing statement. The Bank must hear from me no later than 60 days after the Bank sent me the first billing statement on which the suspected error or problem appears. I can telephone the Bank, but doing so will not preserve my rights.

In my letter, I will provide the Bank with the following information:

- My name, Account number and daytime phone number, and
- The dollar amount of the suspected error, and
- A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized the Bank to pay my minimum monthly payment automatically from my checking account at the Bank, I can stop the payment of any scheduled automatic payment if I believe a billing error has occurred. To stop the payment, my letter must reach the Bank at least three business days before the automatic payment is scheduled to occur.

**My Rights And The Bank's Responsibilities After Receipt Of My Written Notice**

The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the billing statement was correct.

After the Bank receives my letter, the Bank cannot try to collect any amount I question, or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while the Bank is researching my Account, but I am still obligated to pay the parts of my bill that are not in question.

If the Bank finds that a mistake was made on my billing statement, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank determines I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports me to that I have a question about my bill. And, the Bank must tell me the name of anyone the Bank reports me to. When the matter has been settled between the Bank and me, the Bank must tell anyone the Bank reports me to that the matter has been settled.

If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my billing statement was correct.

## SECTION 25:  NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement may be given by mailing it to my address as set forth above in this Agreement, or to a different address if I have properly notified the Bank of that different address. Any notice that I may send to the Bank must be given by mailing it to the Bank at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

I agree that the Bank may contact me by telephone. I agree to accept calls from the Bank at any telephone number that I provide to the Bank.

## SECTION 26:  ADDENDA

I agree to the following attached addenda, modifications or amendments:

N/A

## SECTION 27:  STATE DISCLOSURES

**NOTICE TO BORROWER:   THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTERST RATE.**

THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE CLOSING DOCUMENTS EXECUTED HEREWITH CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

### NOTICE TO THE BORROWER

SmartFit Agreement

**DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED. READ THIS AGREEMENT BEFORE SIGNING IT.**

## ACKNOWLEDGMENT

I have received, read and retained a copy of this SmartFit Home Equity Account® Agreement and Disclosure Statement (the "Agreement"), the Security Instrument, the Agreement to Provide Insurance, and the HUD Settlement Statement provided to me at the closing, all of which I agree to by signing this Agreement. The HUD Settlement Statement is incorporated into and made a part of this Agreement. I acknowledge receipt of the SmartFit Home Equity Account® Important Terms disclosure and the home equity brochure when I applied for this Account. In addition, I hereby agree that the terms of this Agreement replace the terms of any prior oral or written agreements between the Bank and me about this Account, including, for example, any and all commitment letters and pre-approval letters between the Bank and me about this Account.

_Michelle Bonner_ (Seal)    1/2/07
BORROWER                              DATE SIGNED
**MICHELLE L BONNER**

_____ (Seal)    _____
BORROWER                              DATE SIGNED

_____ (Seal)    _____
BORROWER                              DATE SIGNED

_____ (Seal)    _____
BORROWER                              DATE SIGNED

_____ (Seal)    _____
BORROWER                              DATE SIGNED

_____ (Seal)    _____
BORROWER                              DATE SIGNED

_____ (Seal)    _____
BORROWER                              DATE SIGNED

_____ (Seal)    _____
BORROWER                              DATE SIGNED

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
30-00-40897-00-5    ABINGTON
1088 MAPLE AVE
THORP WILLIAM A & LENA J                    $5.00
B 235  U 084  L 3  1101  DATE: 01/16/2007    LO

$R^r$ $R$ $-1st mtg$

After Recording Return To:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557
MAC B6908-012
Billings, MT 59107-9900
1-866-820-9199
(Name & Address and Tel. No.)

This instrument prepared by:
Wells Fargo Bank, N.A.
JESSICA EMBREE
DOCUMENT PREPARATION
7185 VISTA DRIVE
WEST DES MOINES, IOWA 50266
800-580-2195
(Name & Address and Tel. No.)

CHARTER ABSTRACT CO. INC.
7242 HOLLYWOOD ROAD
FORT WASHINGTON, PA 19034

Whose property address is
**1088 MAPLE AVENUE, GLENSIDE,**
**PENNSYLVANIA 19038**
Parcel#

[Space Above This Line For Recording Data]

Reference:                                              Account number:
UPI number:

# HOME EQUITY LINE OF CREDIT
## OPEN-END MORTGAGE
### (Securing Future Advances)

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined elsewhere in this document. Certain rules regarding the usage of words used in this document are also provided in Section 14.

**(A)** "**Security Instrument**" means this document, which is dated **JANUARY 02, 2007**, together with all Riders to this document.
**(B)** "**Borrower**" is **MICHELLE L. BONNER**. Borrower is the mortgagor under this Security Instrument.
**(C)** "**Lender**" is **Wells Fargo Bank, N.A.**. Lender is a national bank organized and existing under the laws of the United States. Lender's address is **101 North Phillips Avenue, Sioux Falls, SD 57104**. Lender is the mortgagee under this Security Instrument.
**(D)** "**Debt Instrument**" means the loan agreement or other credit instrument signed by Borrower and dated **JANUARY 02, 2007**. The Debt Instrument states that Borrower owes Lender, or may owe Lender, an amount that may vary from time to time up to a maximum principal sum outstanding at any one time of, **ONE HUNDRED SIXTY-EIGHT THOUSAND AND 00/100THS** Dollars (U.S. $ **168,000.00**) plus interest. Borrower has promised to pay this debt in Periodic Payments and to pay the debt in full not later than **January 02, 2047**. The Lender is contractually obligated to make future advances as provided in the Debt Instrument.

*(page 1 of 15 pages)*

PA OPEN-END SECURITY INSTRUMENT

Documents Processed 12-29-2006, 16:43:46

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means all amounts owed now or hereafter under the Debt Instrument, including without limitation principal, interest, any prepayment charges, late charges and other fees and charges due under the Debt Instrument, and also all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| N/A | Leasehold Rider | | |
| N/A | Third Party Rider | N/A Other(s) [specify] | N/A |

**(H) "Applicable Law"** means all controlling applicable federal law and, to the extent not preempted by federal law, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that may be imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amounts as they become due for principal, interest and other charges as provided for in the Debt Instrument.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Debt Instrument and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) all future advances made pursuant to the Debt Instrument, (ii) the repayment of the Loan, and all future advances, renewals, extensions and modifications of the Debt Instrument, including any future advances made at a time when no indebtedness is currently secured by this Security Instrument; and (iii) the performance of Borrower's covenants and agreements under this Security Instrument and the Debt Instrument. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the

| **County** | of | **MONTGOMERY** | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

Parcel Identification number: ████████

**SEE ATTACHED EXHIBIT**

which currently has the address of _____ **1088 MAPLE AVENUE** _____

[Street]

_____**GLENSIDE**_____, Pennsylvania \_\_\_\_\_**19038**\_\_\_\_\_ ("Property Address"):

[City]                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." The Property shall also include any additional property described in Section 20.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the execution date of this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Debt Instrument and any prepayment charges, late charges and other charges due under the Debt Instrument. Payments due under the Debt Instrument and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Debt Instrument or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Debt Instrument and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in (or in accordance with) the Debt Instrument or at such other location as may be designated by Lender in accordance with the notice provisions in Section 13. Subject to Applicable Law, Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future.

**2. Application of Payments or Proceeds.** Unless other procedures are set forth in the Debt Instrument or Applicable Law, Lender may apply payments in any order that Lender deems appropriate.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Debt Instrument shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) has disclosed such lien to Lender at application for the Loan or agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien

that can attain priority over this Security Instrument and which was not disclosed on the application for the Loan that Borrower provided to Lender, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions satisfactory to Lender set forth above in this Section 3.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Debt Instrument up to the amount of the outstanding loan balance. Upon Lender's request, Borrower shall promptly give to Lender copies of all policies, renewal certificates, receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Debt Instrument up to the amount of the outstanding loan balance.

In the event of loss and subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights, the following provisions in this Section 4 shall apply. Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be

paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Debt Instrument or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Debt Instrument or this Security Instrument, whether or not then due, subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights.

**5. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless (a) Borrower has disclosed to Lender at application for the Loan that the Property shall not be Borrower's principal residence; (b) Lender otherwise agrees in writing, which consent shall not be unreasonably withheld; or (c) unless extenuating circumstances exist which are beyond Borrower's control.

**6. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**7. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, (a) representations concerning Borrower's occupancy of the Property as Borrower's principal residence and (b) liens on the Property that have priority over this Security Instrument.

**8. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument or any obligation that is secured by a lien that is superior to this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under

this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of any lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**9.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, if the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, in the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Subject to the rights of any lienholder

PA-OPEN-END SECURITY INSTRUMENT,

with rights to Miscellaneous Proceeds that are superior to Lender's rights, any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Joint and Several Liability; Co-mortgagors; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who signs this Security Instrument but does not execute the Debt Instrument (a "co-mortgagor"): (a) is signing this Security Instrument only to mortgage, grant and convey the co-mortgagor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Debt Instrument without the co-mortgagor's consent.

Subject to the provisions of Section 16, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**12. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Debt Instrument or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Debt Instrument). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**13. Notices.** Unless otherwise described in the Debt Instrument or in another agreement between Borrower and Lender, the following provisions regarding notices shall apply. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address for Borrower under the Loan at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**14. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and, to the extent not preempted by federal law, the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Debt Instrument conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Debt Instrument which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; (c) the word "may" gives sole discretion without any obligation to take any action; and (d) headings that appear at the beginning of the sections of this Security Instrument are inserted for the convenience of the reader only, shall not be deemed to be a part of this Security Instrument, and shall not limit, extend, or delineate the scope or provisions of this Security Instrument.

**15. Borrower's Copy.** Borrower shall be given one copy of the Debt Instrument and of this Security Instrument.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 16, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 13 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**17. Sale of Debt Instrument; Change of Loan Servicer; Notice of Grievance.** The Debt Instrument or a partial interest in the Debt Instrument (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Debt Instrument and this Security Instrument and performs other mortgage loan servicing obligations under the Debt Instrument, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Debt Instrument. If there is a change of the Loan Servicer, Borrower will be given written notice of the change as required by Applicable Law. If the Debt Instrument is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Debt Instrument, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the purchaser of the Debt Instrument unless otherwise provided by the purchaser of the Debt Instrument.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 13) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 16 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17. If Borrower and Lender have entered into an agreement to arbitrate disputes, the provisions of any such arbitration agreement shall supersede any provision in this Section 17 that would conflict with the arbitration agreement.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, mold, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower

PA OPEN-END SECURITY INSTRUMENT

shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**19. Assignment of Leases and Rents.** Borrower irrevocably grants, conveys, sells and assigns to Lender as additional security: (a) all of Borrower's right, title and interest in and to any and all existing or future leases, subleases, and any other written or verbal agreements for the use and occupancy of any portion of the Property, including any extensions, renewals, modifications or substitutions of such agreements (all referred to as "Leases"), and (b) all of the rents, security deposits, issues and profits arising out of or earned in connection with the Property (all referred to as "Rents").

Borrower will promptly provide Lender with true and correct copies of all existing and future Leases. Borrower may collect, receive, enjoy and use the Rents so long as Borrower is not in default under the terms of this Security Instrument. Borrower agrees that this assignment is immediately effective between the parties to this Security Instrument. Borrower agrees that this assignment is effective as to third parties when Lender takes affirmative action prescribed by law, and that this assignment will remain in effect during any redemption period until the Loan is satisfied.

Borrower agrees that Lender may take actual possession of the Property without the necessity of commencing legal action and that actual possession is deemed to occur when Lender, or its agent, notifies Borrower of an event of default and demands that any tenant pay all future Rents directly to Lender. On receiving notice of an event of default, Borrower will endorse and deliver to Lender any payment of Rents in Borrower's possession and will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Unless Applicable Law provides otherwise, all Rents collected by Lender or Lender's agent shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by this Security Instrument in the order provided for in Section 2. If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any amounts disbursed by Lender for such purposes shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Borrower warrants that no default exists under the Leases or any applicable landlord/tenant law. Borrower agrees to maintain and require any tenant to comply with the terms of the Leases and applicable law.

**20. Condominiums; Planned Unit Developments.** If the Property is a unit in a condominium project ("Condominium Project") or is part of a planned unit development ("PUD"), Borrower agrees to the following:

A. **Obligations.** Borrower shall perform all of Borrower's obligations under the Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project or PUD and any condominium association, homeowners association or equivalent entity ("Community Association"); (ii) any by-laws or other rules or regulations of the Community Association; and (iii) other equivalent documents. Borrower shall promptly pay, when due, all Community Association Dues, Fees, and Assessments.

B. **Property.** For units in a Condominium Project, the Property includes the unit in, together with an undivided interest in the common elements of, the Condominium Project, and Borrower's interest in the Community Association and the uses, proceeds and benefits of Borrower's interest. For PUDs, the Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in the Constituent Documents, and Borrower's interest in the Community Association and the uses, benefits and proceeds of Borrower's interest.

C. **Property Insurance.** So long as the Community Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then Borrower's obligation under Section 4 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Community Association policy. Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy. In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements of the Condominium Project or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower, subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights.

D. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Community Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

E. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements of the Condominium Project or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the rights of any lienholder with rights to such proceeds that are superior to Lender's rights. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 9.

F. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project or PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Community Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Community Association unacceptable to Lender.

G. **Remedies.** If Borrower does not pay Community Association Dues, Fees, and Assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph G shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest at the rate applicable to the Debt

Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies. Borrower will be in default if (1) any payment required by the Debt Instrument or this Security Instrument is not made when it is due; (2) Lender discovers that Borrower or any co-applicant has committed fraud or made a material misrepresentation in connection with the Loan; (3) Borrower takes any action or fails to take any action that adversely affects Lender's rights under this Security Instrument, any of Lender's other security for the Debt Instrument, or any right Lender has in the Property; or (4) Borrower is an executive officer of Lender and federal law permits or requires immediate payment of the Loan. If a default occurs (other than under Section 16 or under subsection (4) of this Section 21, unless Applicable Law provides otherwise), Lender will give Borrower notice specifying: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**22. Release.** Upon payment of all sums secured by this Security Instrument and termination of line of credit created by the Debt Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**23. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**24. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**25. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Debt Instrument or in an action of mortgage foreclosure shall be the rate payable from time to time under the Debt Instrument.

**Notice to borrower: This document contains provisions for a variable interest rate.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ _____ (Seal)
Borrower **MICHELLE BONNER**

_Michelle Bonner_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

## CERTIFICATE OF RESIDENCE OF MORTGAGEE

I certify that the precise address of the within-named Mortgagee is: **101 North Phillips Avenue, Sioux Falls, SD 57104**

Name:
Agent of Mortgagee

Documents Processed 12-29-2006, 16:43:46

For An Individual Acting In His/Her Own Right:

State of _Pennsylvania_

County of _Montgomery_

On this, the _3rd_ day of _January_ , 20_07_ , before me, the undersigned officer, personally appeared _Michelle L. Bonner_

_____, known to me (or satisfactorily proven) to be the person whose name _was_ subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

_Trina A. Lilley_
_____
Title of Officer

My Commission expires: _____

```
COMMONWEALTH OF PENNSYLVANIA
         NOTARIAL SEAL
  TRINA A. LILLEY, Notary Public
Whitemarsh Twp., Montgomery County
My Commission Expires March 3, 2009
```

# *Stewart Title Guaranty Company*

Commitment No.: ████████

## SCHEDULE C

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, situate in the Township of Abington, County of Montgomery, Commonwealth of Pennsylvania, bounded and described according to a Plan of Property made for Thomas R. Gaul, by Charles E. Shoemaker, Inc., Engineers and Surveyors, Abington, Pa., dated October 6, 1980 and recorded in the Office of the Recorder of Deeds, Montgomery County, Pennsylvania, in Plan Book
B-39 page 10, as follows, to wit:

BEGINNING at a point on the Northwesterly side of Maple Avenue (40 feet wide) said point being measured South 46 degrees 35 minutes West, along the said Northwesterly side of Maple Avenue, 117.29 feet from a point of intersection formed by the said Northwesterly side of Maple Avenue and the Southwesterly side of Susquehanna Road (80 feet wide); thence extending from said point of beginning South 46 degrees 35 minutes West still along the Northwesterly side of Maple Avenue, 50 feet to a point, a corner of Lot No. 2328 Plan of "Ferguson's North Glenside" thence extending along Lot No. 2328 North 43 degrees 25 minutes West 100 feet to a point, a corner of Lot No. 2326 Plan of Ferguson's North Glenside" thence extending along Lot No. 2326 Plan of "Ferguson's North Glenside" North 46 degrees 35 minutes East 50 feet to a point, a corner of Lot No. 2; thence extending along Lot No. 2 South 43 degrees 25 minutes East 100 feet to the first mentioned point and place of beginning.

CONTAINING in area 5,000 square feet.

BEING Lot No. 3 as shown on the first mentioned plan.

BEING known as 1088 Maple Avenue.

BEING County Parcel Number ████████

BEING the same premises which Thomas R. Gaul and Regina M. Gaul, husband and wife by Deed dated January 12, 1981 and recorded January 13, 1981 in Montgomery County in Deed Book 4596 page 262 granted and conveyed unto William A. Thorp and Lena J. Thorp, husband and wife in fee.

AND THE SAID Lena J. Thorp has since departed this life on or about _5/29/86_, whereby title vested solely in the name of William A. Thorp by right of survivorship.

This commitment is invlalid unless the Insuring Provisions and Schedules A and B are attached.

RECORDER OF DEEDS
MONTGOMERY COUNTY
*Nancy J. Becker*



One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
Office: (610) 278-3289 ~ Fax: (610) 278-3869

MTG BK 12004 PG 00085 to 00101
INSTRUMENT # ████████
RECORDED DATE: 01/16/2007 02:54:52 PM



MONTGOMERY COUNTY ROD

**OFFICIAL RECORDING COVER PAGE**     Page 1 of 17

| | |
|---|---|
| Document Type: Mortgage | Transaction #: |
| Document Date: 01/02/2007 | Document Page Count: 16 |
| Reference Info: Bonner/Wells | Operator Id: emiller2 |

**RETURN TO:**
CERTIFIED ABSTRACT COMPANY INC
7242 HOLLYWOOD ROAD
FORT WASHINGTON, PA 19034

**SUBMITTED BY:**
CERTIFIED ABSTRACT COMPANY INC
7242 HOLLYWOOD ROAD
FORT WASHINGTON, PA 19034

**\* PROPERTY DATA:**
Parcel ID #: ████████
Address: 1088 MAPLE AVE

        PA
Municipality:
School District:

**\* ASSOCIATED DOCUMENT(S):**

**FEES / TAXES:**

| | |
|---|---|
| Recording Fee:Mortgage | $46.50 |
| Additional Pages Fee | $24.00 |
| Affordable Housing Pages | $24.00 |
| **Total:** | **$94.50** |

MTG BK 12004 PG 00085 to 00101
Recorded Date: 01/16/2007 02:54:52 PM

I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office in Montgomery County, Pennsylvania.

Nancy J. Becker
Recorder of Deeds

# PLEASE DO NOT DETACH
## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always supersedes.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.